UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————

SHANELL MARTINEZ,                                    Civil Action No: 22-cv-3111

                              Plaintiff,             **THIRD AMENDED COMPLAINT**

          -against-                                  ***Jury Trial Demanded***

189 CHRYSTIE STREET PARTNERS, LP,
d/b/a THE BOX, VARIETY WORLDWIDE, LLC,
SIMON HAMMERSTEIN, JAVIER VIVAS,
GIZA SELIMI, and NENAD KARAC,

                              Defendants.

———————————————————————

   PLAINTIFF SHANELL MARTINEZ by her attorneys at Goddard Law PLLC, whose

offices are located at 39 Broadway, Suite 1540, New York, New York 10006, alleges upon

knowledge with respect to herself, and upon information and belief as to all other matters, as

follows:

<u>**PRELIMINARY STATEMENT**</u>

   1.  Like many young women working their way through school with no financial help,

Plaintiff Shanell Martinez had to work. She was thrilled to be hired at The Box nightclub, where she

thought that she would make good money working as a bottle server. Instead, she learned that she

was actually hired to be physically, verbally, and sexually harassed by management, to allow

customers to sexually harass and abuse her, and to lure male customers to The Box so that they could

be sexually serviced by others.

   2.  This is a civil action brought on behalf of Plaintiff against Defendant 189 Chrystie

Street Partners, LP ("Defendant 189 Chrystie Street") d/b/a The Box ("Defendant The Box"), Variety

Worldwide, LLC ("Defendant Variety Worldwide"), Defendant Simon Hammerstein ("Defendant

Hammerstein"), Defendant Javier Vivas ("Defendant Vivas"), Defendant Giza Selimi ("Defendant

Selimi"), and Defendant Nenad Karac ("Defendant Karac") (collectively known as

"Defendants") for gender discrimination, sexual harassment, race discrimination, and retaliation in violation of the New York State Human Rights Law and the New York City Human Rights Law; violations of the Trafficking Victims Protection Act (TVPA), the Fair Labor Standards Act (FLSA), and the New York Labor Law (NYLL); Breach of Contract; Fraud and Unjust Enrichment; Retaliatory Discharge; and Fraudulent Inducement; as well as together with any and all other causes of action which can be reasonably inferred from the facts as set forth below.

## PARTIES

3.      Plaintiff Shanell Martinez ("Plaintiff") is a Latina female citizen of the United States who currently resides in New York, New York and who was formerly employed by Defendant 189 Chrystie Street Partners, LP ("Defendant 189 Chrystie Street") d/b/a The Box ("Defendant The Box"), Variety Worldwide, LLC ("Defendant Variety Worldwide"), Defendant Simon Hammerstein ("Defendant Hammerstein"), Defendant Javier Vivas ("Defendant Vivas"), Defendant Giza Selimi ("Defendant Selimi") and Defendant Nenad Karac ("Defendant Karac") (collectively known as "Defendants").

4.      Upon information and belief, at all times herein, Defendant 189 Chrystie Street was, and is, a corporation registered in New York and permitted to do business in New York, and which owns and operates Defendant The Box. Upon information and belief, Defendant 189 Chrystie Street's headquarters are located at 189 Chrystie Street, New York, New York 10002, where Plaintiff was employed. Also, upon information and belief, Defendant 189 Chrystie Street is an enterprise engaged in commerce, whose gross volume of sales made, or business done, is in excess of $500,000 as defined by 29 U.S.C. § 203(s).

5.      Upon information and belief, at all times herein, Defendant The Box is a night club in New York City and was, and is, a corporation registered in New York and permitted to do business in New York. Upon information and belief, Defendant The Box's headquarters are located

2

at 189 Chrystie Street, New York, New York 10002, where Plaintiff was employed. Also, upon information and belief, Defendant The Box is an enterprise engaged in commerce, whose gross volume of sales made, or business done, is in excess of $500,000 as defined by 29 U.S.C. § 203(s).

6.     Upon information and belief, at all times herein, Defendant Variety Worldwide was and is a corporation registered in Delaware and permitted to do business in New York, and which owns and operates Defendant The Box. Upon information and belief, Defendant Variety Worldwide's headquarters are located at 189 Chrystie Street, New York, New York 10002, where Plaintiff was employed. Also, upon information and belief, Defendant Variety Worldwide is an enterprise engaged in commerce, whose gross volume of sales made, or business done, is in excess of $500,000 as defined by 29 U.S.C. § 203(s).

7.     Upon information and belief, Defendant Simon Hammerstein is the Founder, Owner, and Creative Director of Defendant The Box, and was a supervisor to Plaintiff. Defendant Hammerstein was employed at Defendant The Box's headquarters located at 189 Chrystie Street, New York, New York 10002, where Plaintiff was employed.

8.     Upon information and belief, Defendant Javier Vivas is the Chief Operating Officer of Defendant The Box, and was a supervisor to Plaintiff. Defendant Vivas was employed at Defendant The Box headquarters located at 189 Chrystie Street, New York, New York 10002, where Plaintiff was employed.

9.     Upon information and belief, Defendant Giza Selimi is a Manager at Defendant the Box, and was a supervisor to Plaintiff. Defendant Selimi was employed at Defendant The Box's headquarters located at 189 Chrystie Street, New York, New York 10002, where Plaintiff was employed.

10.     Upon information and belief, Defendant Nenad Karac is a Manager at Defendant The Box, and was a supervisor to Plaintiff. Defendant Karac was employed at Defendant The Box's

headquarters located at 189 Chrystie Street, New York, New York 10002, where Plaintiff was employed.

11.     Defendant Hammerstein, Defendant Vivas, Defendant Selimi, and Defendant Karac are hereinafter collectively referred to as "Defendants."

12.     Upon information and belief, Defendants have power over personnel and payroll decisions at Defendant The Box.

13.     Upon information and belief, Defendants have the power to hire and fire employees at Defendant The Box, establish and pay their wages, set their work schedule, and maintain their employment records.

14.     Defendants are and were, at all times relevant herein, Plaintiff's "employer" within the meaning of all relevant Federal, State and local laws.

15.     Plaintiff is and was, at all times relevant herein, Defendants' "employee" within the meaning of all relevant Federal, State and local laws.

16.     Defendants are part of a single integrated enterprise that jointly employed Plaintiff at all times relevant to this Second Amended Complaint, and the individual Defendants are engaged in activities performed for a common business purpose as defined by the FLSA.

**<u>JURISDICTION, VENUE, AND PROCEDURAL REQUIREMENTS</u>**

17.     This is a civil action for monetary damages and such other relief as the Court deems just and proper based upon Defendants' discrimination against Plaintiff based on race, gender, as well as Defendants' retaliation against Plaintiff, and based upon her claims under the Trafficking Victims Protection Act.

18.     This Court has Jurisdiction over this action under 42 U.S.C.A. § 2000(e) et. seq., and under 28 U.S.C.A. §§1331 and 1343(4).  This Amended Complaint is also brought pursuant to the New York State Human Rights Law, the New York City Human Rights Law, the Fair Labor Standards Act and the New York Labor Law

19.     Venue for this action properly lies in this district pursuant to 28 U.S.C § 1391.

## **INTRODUCTION**

20.     Defendant Simon Hammerstein ("Defendant Hammerstein") is an individual who owns and operates two nightclubs named "The Box" –one on the Lower East Side of Manhattan and one in London, the United Kingdom.

21.     Defendant Vivas is the Chief Operation Officer of Defendant The Box and regularly travels between London and New York.

22.     Defendant Selimi is a Manager and Partner at Defendant The Box, and Defendant Karac is a Manager at Defendant The Box.

23.     In their respective roles at Defendant The Box, Defendant Hammerstein, Defendant Vivas, Defendant Selimi, and Defendant Karac knowingly ordered and coerced female waitresses, performers, and employees to dress provocatively and travel throughout New York City in order to lure male customers to Defendant The Box, where they would be serviced with sexual acts, sexual intercourse, drugs, and excessive alcohol by other female employees who had been forced to perform these acts. The Defendants forced these female employees to do this with promises to them of money, advancement, access to wealthy and celebrity clients, and career advancement. The female employees were threatened with termination or loss of their shifts if they did not comply. Defendant Hammerstein, Defendant Vivas, Defendant Selimi, and Defendant Karac forced these female employees to use their personal phones, their work email addresses, and their social media accounts to set up "dates" with clients, and lure them to Defendant The Box for sex and sexual favors by other women.

24.     Plaintiff Shanell Martinez was hired at Defendant The Box as a waitress in 2017 at the age of 25, and was immediately sexually harassed by Defendant Hammerstein in The Box's public bathroom.

25.     While working at Defendant The Box, Plaintiff was ordered by Defendant Hammerstein, Defendant Vivas, Defendant Selimi, and Defendant Karac to wear provocative clothes and frequent New York bars and restaurants in order to lure male customers to Defendant The Box. There, the Defendants ordered and coerced female employees to service male customers with sex, drugs, and alcohol. The individual Defendants told Plaintiff that she would be paid a commission for each customer she brought to Defendant The Box, and, as required, Plaintiff worked hard and during hours outside of her "shifts" to bring in clients, but in fact, Defendants never paid her for the vast majority of the commissions she was owed, and upon information and belief, never intended to do so. Plaintiff was also told she would be given work shifts and career advancement if she brought in clients, and would be denied waitressing shifts or terminated if she did not do so.

26.     Meanwhile, during her waitressing shifts at Defendant The Box, Plaintiff was ordered to drink alcohol with clients and managers and to allow male clients to sexually harass her. Defendants punished Plaintiff when she tried to protect herself from sexual harassment, and told Plaintiff to give male clients "ANYthing they wanted."

27.     These policies, procedures, schemes, and ventures at Defendant The Box—which were facilitated by Defendant Hammerstein, Defendant Vivas, Defendant Selimi, and Defendant Karac—were  "open secrets" in the entirety of the company, and the Defendant Corporate Owners, including Defendant 189 Chrystie Street Partners, LP ("Defendant 189 Chrystie Street") d/b/a The Box ("Defendant The Box"), and Variety Worldwide, LLC ("Defendant Variety Worldwide") actively participated in these policies, procedures, schemes, and ventures. These policies and procedures provided direct monetary and financial gain and growth to the Defendant corporations.

28.     Plaintiff was also relentlessly sexually harassed by Defendant Nenac, and suffered retaliation when she rejected Defendant Nenac's sexual advances. Plaintiff reported the sexual

harassment to Defendant Vivas, but he disregarded her report, falsely told her that her report had not been corroborated, and utterly failed to act.

29.    Finally, Defendants abjectly failed to pay Plaintiff the required minimum wage under New York City law, and failed to pay her for the work she performed "off the clock" for Defendants in violation of the New York Labor Law. This unpaid work included the work she performed during the first half hour after she arrived at work, the many, many hours she spent recruiting potential clients at bars and restaurants in New York City, and time she spent attending regular lengthy staff meetings.

30.    Despite all this, Plaintiff stayed at Defendant The Box, because she desperately needed a job that would help pay for her education and her rent.

## FACTUAL BACKGROUND

### Plaintiff is "Interviewed" at Defendant The Box

31.    Plaintiff Shanell Martinez ("Plaintiff") is a Latina woman who was born and raised in New York City, and who had worked in the service industry for many years. In or about July 2017, Plaintiff was a full-time student at City University of New York (CUNY) Lehman College, working towards a bachelor's degree in Psychology and Theater, and needed a job that would pay for school, and pay her bills. Plaintiff was introduced by an acquaintance of Giza Selimi, ("Defendant Selimi"), a Manager at The Box ("Defendant The Box"), who told her that she could make large amounts of money if she waitressed at Defendant The Box and recommended her for a waitressing job there.

32.    In or about July 2017, Plaintiff arrived for a meeting at Defendant The Box with General Manager Nenad Karac ("Defendant Karac") and Manager Cristina Silva ("Manager

33.    Silva"). Defendant Karac, who did most of the talking, looked up and down at Plaintiff's face and body in a sexual manner. He said that since she came recommended by his boss, Defendant Selimi, she didn't need a full "interview." He then told Plaintiff that one "benefit" of working at Defendant The Box would be that when she brought in new clients, she would receive

10% of their spending at the club each quarter.  He also told her that while working at Defendant The Box she must wear sexy, provocative, flashy, and minimal clothing that would be "pleasing" to the male clientele. Defendant Karac then told Plaintiff that she was hired, and asked if she could start "that night." She said she could not, and he told her to return for three days of training.  Shockingly, the training was entirely unpaid, but Plaintiff was made to feel as if she was lucky to even have the chance to train.

**Defendants Engage in Interstate and/or Foreign Commerce, and the Corporate Defendants Are Aware of and Promulgate Defendant The Box's Policies and Procedures**

34.     Upon information and belief, finances and funds for The Box in London are, and were, comingled with finances and funds for Defendant The Box night club in New York City. Also, upon information and belief, Defendants recruited and hired female employees – including waitresses and theater performers in—London, New York, and across the United States to work at the Box in London and/or New York. Also, upon information and belief, Defendants promoted Defendant The Box on the internet, and on social media, across the United States. In these ways, Defendants engaged in interstate and foreign commerce.

35.     Also, upon information and belief, Defendant The Box was owned and operated by the Defendant corporate owners: Defendant 189 Chrystie Street Partners, LP ("Defendant 189 Chrystie Street") and Variety Worldwide, LLC ("Defendant Variety Worldwide"), who were intricately involved in the running of Defendant The Box, and were aware of, and promulgated, Defendant The Box's policies, procedures, and ventures, including those policies, procedures and ventures that affected Plaintiff, and other female employees. Defendant 189 Chrystie Street and Variety Worldwide, LLC knowingly benefitted financially from policies, procedures, and ventures at Defendant the Box.

**Plaintiff is Sexually Harassed and Propositioned During her First Shift**

36.     Upon information and belief, Defendant The Box is a nightclub and cabaret theater in Lower Manhattan catering to an expensive, celebrity, and exclusive clientele. The theater's cabaret performances feature sexually explicit content, involving sex, nudity, and sex toys. Upon information and belief, a table reservation at Defendant The Box costs approximately $1,000 to $10,000 or more.

37.     Plaintiff arrived at Defendant The Box for her first unpaid training night, which was a Tuesday night. Plaintiff had worked in New York nightclubs previously and believed that she could take care of herself, and she needed the money that Defendant The Box offered for her college fees and living expenses, and so she began work.

38.     Defendant Karac personally introduced Plaintiff to one of the clients at the venue and told to her "take real good care of them."  Immediately, one of the men she was bringing a drink to, put his arms around her waist and pulled her towards him in a sexual manner. Plaintiff politely pushed his arm away and said, "No, let's not do that." Plaintiff spent the evening trying to "entertain" the men at the table, pretending to drink with them, and drinking small amounts of alcohol, because this is what was expected of her at Defendant The Box.

39.     Later in the evening, when Plaintiff spoke to a more experienced waitress, Jane Doe, who was, upon information and belief, in her 30s, Jane Doe complained to Plaintiff that Defendant Karac had previously scheduled her for weekend shifts, which were much more lucrative,  but he now only put her on week-day shifts, which were far less desirable and less lucrative. She told Plaintiff that she had objected to Defendant Karac that her weekend shift had been given to a newer, younger waitress without her experience (who was, upon information and belief, in her 20s) and that Defendant Karac had replied that she was "too old," and they wanted "younger" waitresses on the weekend shifts.

40.     It was clear to Plaintiff that Defendants discriminated against "older" waitresses, meaning those not in their 20s, on the basis of age because they wanted to order and coerce young girls in their 20s to "please" male clientele.

### Plaintiff Is Ordered to Allow Male Clients to Sexually Harass Her, Or She Would Be Terminated

41.     The second training day, Plaintiff was asked to come in earlier for a meeting with Defendant Karac and Defendant Selimi. When Plaintiff arrived at work, Defendant Selimi told her that another employee who had been working on her first training night had seen and told him about the incident in which the male client had put his arm around Plaintiff's waist in a sexual manner, and Plaintiff had moved the client's arm away from her.

42.     Defendant Selimi said that Defendant The Box was "not like a normal club," was a "different environment," and that she had "to accept that the male clientele are going to be drunk and touch her and be handsy." He told her she was "part of the experience" and that if she wasn't comfortable with the clientele touching her in a sexual manner (i.e. sexually harassing her) then Defendant The Box was not a place that she should work.  Plaintiff, who had worked in night clubs before, was surprised at this order to allow male clientele to sexually harass and touch her and she was shocked to hear that sexually touching her was part of the experience that Defendant The Box supplied to its customers.

43.     She told Defendant Selimi and Defendant Karac that she understood, but said that she was able to entertain clients while "taking care of" herself.

44.     Defendant Selimi and Defendant Karac told her that they would be watching her performance, and sent her to work her second, unpaid training shift.

**Plaintiff Fears Sexual Assault Her Second Night of Training**

45.     On Plaintiff's second night of training, she was told by Manager Silva to "take care of" a large group of 60 to 70-year old white men in business suits at a table, which included flirting with them, drinking alcohol shots with them, and giving them "anything that they wanted," because this is what the management at Defendant The Box expected of the female waitresses.

46.     At the end of the evening, one of the men at her table pressured her to go home and have sex with him, and she politely declined. He told her that he would be "waiting for her" outside the club if she changed her mind. At the end of the night, Plaintiff asked Defendant Selimi, who worked at the club door, if the man was still waiting for her and he said "yes." Plaintiff was forced to exit through the back of the club in order to avoid being harassed or even sexually assaulted by the male client.

**Plaintiff Is Sexually Harassed by Defendant Hammerstein in Their First Meeting**

47.     In or about August 2017, her first month of working at Defendant The Box, Plaintiff was finally getting paid for her shifts after her training period of three days. Defendant Hammerstein came into Defendant The Box and was introduced to Plaintiff as a new waitress. He looked at her approvingly and called her "sexy" and then told her that he would give her a tour of the upstairs of the club.

48.     Defendant Hammerstein took Plaintiff's hand and showed her the "private rooms" with velvet curtains where male customers could be serviced with sex and sex acts.

49.     Defendant Hammerstein then led Plaintiff into the bathroom and then into one of the bathroom stalls.  Plaintiff became increasingly tense and felt extremely scared and vulnerable. Defendant Hammerstein ordered her to sit on a bench and put her feet on two small platforms that caused her legs to spread her legs wide open. Plaintiff was terrified that she was about to be sexually assaulted or raped and thought "Oh my god, is he going to rape me?"

11

50.     Defendant Hammerstein forced her to "look up," where she saw a mirror.  To her shock, he then told her that the bathroom stall they were in was where he brought women to have sex with, because he could see himself in the mirror.

51.     He then took her out of the stall, and Plaintiff was incredibly relieved that the owner of the club had not sexually assaulted her, but she was still shaken up and anxious about what had occurred. She knew that if she had not complied with Defendant Hammerstein's orders, she would have been terminated. He finished the tour, and she was sent back to continue working her shift.

**Plaintiff is Ordered to, and Coerced into, Participating in a Gender Discriminatory, Sexually Harassing, and Sexually Exploitative Work Environment**

52.     As soon as Plaintiff began working at Defendant The Box, she was ordered to, and coerced into, working in a gender discriminatory, sexually harassing, and sexually exploitative work environment. Plaintiff did the best she could to protect herself. Though she considered quitting, Plaintiff needed the money that she was receiving through her job to put herself through college and pay her rent and she knew that she could not find a job paying anywhere near as much.

53.     Defendant The Box was continually filled with male clientele who would repeatedly and consistently sexually harass the all-female waitress and performance staff by putting their hands on their bodies, ordering them to sit on their laps, grabbing their breasts, legs, arms and their buttocks, putting their face between their breasts, pressing their male bodies and genitalia against the female employees' bodies, and engaging in other physically harassing and assaulting acts.

54.     Plaintiff and the female waitresses were explicitly ordered by Defendants' management to accept and encourage this sexual assault and harassment, even when they objected to doing so.

55.     Defendant Hammerstein called the female employees "party girls" rather than waitresses and/or servers, making clear to female employees that he expected and required them to "party" with male clients.

56.     Defendants also ordered or coerced Plaintiff and the female staff into drinking and doing drugs such as cocaine at clients' tables, and/or facilitate the purchase of drugs or cocaine at their tables, even when they objected to doing so. Defendant Karac told Plaintiff that if she did not drink with the clients, she would NOT be put on the schedule for another shift. Plaintiff, who wished to remain sober, often drank very small sips of alcohol or pretended to drink even when ordered to do so, and she did not ever do drugs or smoke with clients.

57.     There was also, upon information and belief, present at Defendant The Box a person who could procure drugs, including marijuana or cocaine, for clients.

58.     When Defendant Hammerstein saw Plaintiff in Defendant The Box, he touched her body, called her "gorgeous" and "sexy," he forced her to "smile" and to spin around to show him her body, and asked her if she "had a boyfriend" and what she "did outside of work."

59.     Defendant Karac repeatedly told Plaintiff that she had to dress sexier, show more skin, wear lower-cut shirts and higher skirts, or sheer clothing with lingerie showing, all for the viewing of the male clientele. He also told her to "smile more" and be more compliant with the male clients.

60.     It was absolutely clear that Defendant Hammerstein, Defendant Vivas, and Defendant Karac – who were present at Defendant The Box during these activities - were aware of these activities, and ordered and coerced the female staff to engage in these activities, even if hey objected . These Defendants knew that female employees would be given less lucrative tables, less desirable shifts, or taken off the weekly schedule until the server herself would have to quit on her own if they did not comply, and be given financial benefits and more desirable tables and shifts if they did comply.

61.     Plaintiff was known by Defendant Karac to "hold her own" with male clients and protect herself from their worst behaviors. As such, he often denied her the most lucrative tables

that were located on the main floor, and instead relegated her to the second floor away from wealthy clients because she would not do exactly "what they wanted."

**Plaintiff is Paid Improperly and Not Paid Wages for "Off the Clock"**
**Work for Defendants**

62.     From the beginning of her employment at Defendants in or around July 2017, until on or about December 30, 2017, Plaintiff, a service employee receiving tips working in New York City, was paid at a rate of $8.00 an hour for her scheduled shifts as a server. However, the New York City Minimum Wage for a service employee receiving tips during that time period was $9.15 an hour.

63.     As such, Defendants failed to pay Plaintiff the legally mandated minimum wage in 2017.

64.     From December 31, 2017 to December 30, 2018, Plaintiff was paid $8.75 an hour.

65.     However, the New York City Minimum Wage for a service employee receiving tips during that time period was $10.85 an hour. As such, Defendants failed to pay Plaintiff the legally mandated minimum wage in 2018.

66.     From December 31, 2018 to December 30, 2019, Plaintiff was paid at a rate of $8.75 an hour. However, the New York City Minimum Wage for a service employee receiving tips during that time period was $12.50. As such, Defendants failed to pay Plaintiff the legally mandated minimum wage in 2019.

67.     From December 31, 2019 to the end of her employment, Plaintiff was paid $10.00 an hour. However, the New York City Minimum Wage for a service employee receiving tips during that time period was $12.50. As such, Defendants failed to pay Plaintiff the legally mandated minimum wage from in or around January 2020 until in or around March 2020.

14

68.     For the first three (3) weeks of Plaintiff's employment by Defendants, Plaintiff was required to appear "off the clock" in person at Defendant The Box approximately four (4) days per week for five to six (5-6) hours per day to review Defendants' Clientele List and email or text clients to invite them to reserve a table at Defendant The Box. On average, Plaintiff needed to contact a minimum of approximately one hundred (100) clients per day in order to obtain at least one reservation for the night. If Plaintiff was unable to secure any reservations for the night, she was scheduled to work less hours as punishment by Defendants.

69.     Accordingly, Plaintiff was not paid by Defendants for approximately sixty-six (66) hours spent contacting clients for reservations at Defendant The Box in her first three weeks of employment.

70.     After about three (3) weeks of contacting clients for reservations in person at Defendant The Box, Plaintiff requested to continue doing so remotely to accommodate her schooling schedule, and she continued to do so remotely two to three (2-3) times per week for approximately five hours per day for approximately one (1) month.

71.     Plaintiff was not compensated for her hours spent contacting Defendants' clients remotely, despite having to "check-in" with Defendant Karac to let him know she was contacting clients and being expected to produce results in the form of reservations for the night.

72.     Additionally, if Defendant Karac noticed that there were fewer than three reservations scheduled for the night, he would follow up with Plaintiff on the status of her client outreach to be certain she had done so, or planned to do so, that day. Plaintiff was often required to send Defendant Karac screenshots with evidence of her text messages or emails to clients inviting them to reserve a table at Defendant The Box.

73.     After approximately one (1) month of employment, Defendant Karac grew frustrated with the lack of reservations Plaintiff and her coworkers were able to obtain through client outreach and held a required staff meeting where Plaintiff was told to "start going out and bringing people in."

74.     As such, for the remainder of Plaintiff's employment, Plaintiff went to bars and restaurants approximately three (3) nights per week, from 5:00 pm until 11:00 pm, and two (2) nights per week, from 5:00 pm until 7:30 pm, searching for customers to bring to the Defendant The Box.

75.     On nights that Plaintiff was successful at acquiring a customer for Defendant The Box—which was approximately two to three (2-3) nights per week—Plaintiff was required to accompany the customer(s) to Defendant The Box and keep them entertained throughout the night so that they stayed as late as 4:00 am.

76.     Plaintiff's written shift schedule at Defendant The Box indicated that Plaintiff would be scheduled to work two or three (2 - 3) days a week, from 10:00 pm, until between 4:30 and 5:00 am. As such, Plaintiff was scheduled to work an average of sixteen and a half (16.5) hours per week for Defendants.

77.     However, unlike what was on her written shift schedule, approximately one or two times per week, Defendants forced Plaintiff to work late, from 10:30 pm until 7:00 am, when clients were not ready to leave the nightclub. Although Plaintiff worked these additional hours, she was paid for the "unscheduled" hours between 4:30 am and 7:00 am at her regular rate of pay or at a premium overtime rate if the hours were over forty per week.

78.     Defendants explained to Plaintiff that because Defendants were not legally able to serve clients alcohol past 4:00 am, she could no longer be considered "on the clock" during those extra hours worked into the early mornings.

79.     Although Plaintiff was responsible for clocking herself in at the start of her shift using a personal code, Defendant Karac often manipulated the time records and changed Plaintiff's time of entry and/or clocked Plaintiff out each night before she had finished working.

80.     By way of example, each night Defendants required Plaintiff to arrive at work at 10:00 pm but she was only paid for work after 11:00 pm. As such, Plaintiff was not paid for one hour of work between 10:00 and 11:00 pm throughout her employment.

81.     Additionally, once or twice a week, Defendant Karac would clock Plaintiff out of the timekeeping system immediately at 4:00 am or 4:30 am, even though Plaintiff worked at least a half hour and as long as three to four (3-4) hours beyond that time.

82.     As such, Plaintiff worked nightclub shifts for approximately 7.5 hours in addition to her scheduled hours each week at Defendant The Box and was not compensated by Defendants.

83.     Furthermore, Throughout her employment, Plaintiff was assigned two to three (2-3) "on call" shifts per week. Defendants ordered Plaintiff to be available to report to work at a moment's notice, any time between 5:00 pm to 3:00 am. Plaintiff was not paid for these "on call" shifts, even though she was required to be available for work, she was not able to use the time for her own purposes, and was forced to anxiously wait for a potential phone call bringing her into work. Defendants' policy dictated that if she was not available to work during her "on call" shifts, she would be taken off of the schedule entirely the following week.

84.     As such, Plaintiff was uncompensated for her time "on call" for approximately 25 (twenty-five) hours per week as she was unable to use that time effectively for her own purposes

because she was penalized if she was not available at a moment's notice for Defendants during that time. In order to be available during her time "on call" for Defendants per their expectations, Plaintiff was confined to an area where she would be able to quickly appear at Defendant The Box if needed with her appropriate attire.

85.     In addition, Defendants held mandatory staff meetings twice a month, which lasted two to three (2-3) hours. Plaintiff was not compensated for her time attending these meetings, nor was she compensated for her first three (3) days of training, which consisted of three (3) separate shifts from 10:00 pm to 4:00 am.

86.     Finally, Plaintiff was required to wear a "uniform" of costumes while working as a server at Defendants. She was forced to pay for these uniforms in their entirety and paid for the maintenance and cleaning of these uniforms, without compensation from Defendants.

87.     Upon information and belief, Defendants willfully failed to post notices of the minimum wage and overtime wage requirements in a conspicuous place at the location of their employment as required by both the NYLL and the FLSA.

88.     Upon information and belief, Defendants willfully failed to keep proper payroll records as required by both NYLL and the FLSA.

89.     As a result of these violations of Federal and New York State labor laws, Plaintiff seeks compensatory damages and liquidated damages in an amount exceeding $100,000.00. Plaintiff also seeks interest, attorneys' fees, costs, and all other legal and equitable remedies this Court deems appropriate.

**Plaintiff is Ordered to Use Her Gender and Sexuality to Lure Clients to Defendant The Box in Order to Procure Sex and Sexual Acts by Other Women**

90.     In or about her first month working at Defendant The Box, Defendant Karac told Plaintiff that she must do what they called "clientele" and lure male clients into Defendant The

Box. He informed Plaintiff that she <u>must</u> "clientele" or she would not be able to work at Defendant The Box.

91.     Defendant Karac told Plaintiff that in order to clientele she must go to bars and restaurants in New York City wearing sexy and provocative clothing, talk and flirt with men, "pick them up," and bring them back to Defendant The Box. If these men said no, Plaintiff was told that she must exchange her cell phone number or social media contacts with them in order to invite them to Defendant The Box in the coming days and weeks. She was also told that she had to call former male clientele on her personal cell phone or contact them on social media in order to invite them back to Defendant The Box. Plaintiff also had  "The Box" company email address on which she was ordered to solicit clients.

92.     Defendant Karac ordered Plaintiff to do this and said in no uncertain terms that she would NOT be put on the schedule if she did not "clientele."

93.     Defendant Karac also said that she must go out with other female employees of Defendant The Box in groups to "clientele" together.

94.     Upon information and belief, this ordered policy of doing "clientele" was known, acknowledged and ordered by Defendant Hammerstein, Defendant Vivas, Defendant Selimi and Defendant Karac. Also upon information and belief, Defendant Hammerstein, Defendant Vivas, Defendant Selimi and Defendant Karac knew and acknowledged that these men that Plaintiff and the other female employees were forced and coerced to "pick up" would be serviced with sex acts, sex, and drugs when they reached Defendant The Box, even when the female employees objected to doing so.

95.     Plaintiff did as she was ordered to do in order to keep her job. Defendant The Box told Plaintiff that she would get a commission for each customer that she brought into Defendant

The Box, but she was not fully paid for this commission.  In fact, the July to December 2017 time period was the only time she was paid commission in which she brought in approximately $54,000. She only received approximately $1,797, clearly not 10% as she was promised, even as she continued to be forced to clientele throughout her employment at Defendant The Box. During her off-hours, she went to bars, restaurants, and night clubs in order to "pick up" men to be lured to Defendant The Box. Plaintiff simply had to do so in order to keep her job. Plaintiff paid for drinks and dinner while doing "clientele" out of her own money and was not reimbursed by Defendants. Defendants did not pay Plaintiff for the hours that she spent doing "clientele."

96.     Plaintiff was forced to "clientele" every week, two or three (2-3) times a week, for five or six hours (5-6) per day. Defendant Karac ordered Plaintiff to send him "proof" via text message or an email describing her work doing "clientele," such as where she went, what male clients she met, what the environment was at the bar or restaurant where she was doing "clientele," and whether she was able to bring any male clients back to Defendant The Box. She was told she would be taken off the schedule if she did not do so.

97.     Upon information and belief, Defendants withheld from Plaintiff a total of more than $11,000 in commissions that were owed to her based upon her clienteling for Defendants.

98.     Plaintiff repeatedly requested that Defendants pay her the commissions that she was owed, and objected to not having been paid the commissions. Defendants willfully ignored her requests for payment, did not answer her emails objecting that she had not gotten paid her commissions, and refused to pay her what she was owed.

99.     Upon information and belief, male employees and managers of Defendants, such as Manager Selimi, were paid the commissions that they were owed, unlike Plaintiff and the female employees and waitresses.

100.     Plaintiff was retaliated against for her complaints about wage theft.

**Defendant Selimi Engages in Blatant Race Discrimination, Including Not Allowing Black Clients Inside Defendant The Box**

101.     Plaintiff soon noticed while working at Defendant The Box that there were very few, if any, Black patrons that were given service at Defendant The Box. The only <u>very</u> rare exceptions that she could see were famous, celebrity, or wealthy Black clients.

102.     She learned, and it was common knowledge throughout Defendants, that Defendant Selimi who stood outside the door and was responsible for entry into the nightclub very rarely, if ever, allowed Black clients to enter Defendant The Box as customers.

103.     Plaintiff heard Defendant Selimi make comments about Black potential customers – who were standing outside the club and waiting to gain entry – that they were "trashy," "hood" "ghetto" and other pejorative terms. He said that they had "the wrong vibe," were "not right for the club" or "not a good look for the club," that they "didn't fit in" and they were "not what he/they wanted" simply because they were Black. He refused entry to almost every single Black person who was not famous or a celebrity. He said these things right to Plaintiff's face, who was a woman of color.

104.     One night, Plaintiff came to the door to bring her Black female friend with natural curly hair into the club, and Defendant Selimi denied her entry because, he told Plaintiff, "I don't want her in my club," because her "hair looked crazy" and she "looked crazy with that hair."  This was a clear reference to her friend's African-American hairstyle. Plaintiff, who could not talk back to her manager, apologized to her friend that she couldn't get her into the club.

105.     Plaintiff also heard Defendant Selimi make discriminatory and racist comments towards the Latino kitchen staff and bussers, such as all Hispanics - (and most often Mexicans) were "lazy," and "didn't care" and they "didn't work hard."

106.     As a person of color, Plaintiff was deeply offended by these statements and beliefs at Defendant The Box. Plaintiff unfortunately was forced to try and ignore these statements despite her serious discomfort because she would lose her shifts, be terminated, or retaliated against, if she objected.

**<u>Defendant Karac Relentlessly and Repeatedly Sexually Harasses Plaintiff</u>**

107.     As soon as Plaintiff started working at Defendant The Box, Defendant Karac relentlessly and repeatedly sexually harassed her.

108.     Defendant Karac began by making comments about her appearance, her hair, her breasts, her buttocks, and her body, and asking her to date him or have sex with him. He touched her arms, her shoulders, her buttocks without consent.

109.     He repeatedly invited her to his house, and invited her to dinner or to a bar after work, before work or on the weekends. He also told Plaintiff constantly that he liked "dark-skinned girls" like her, and compared her with other girls bodies. When he had to pass her in a small space, he made sure to brush her buttocks with his penis and give her a knowing look.

110.     Plaintiff declined his advances, said no to his propositions, pulled her body away from him, told him to "stop" and walked away. Nothing would stop his sexual harassment of her.

111.     In or about October 2017, Defendant Karac's sexual harassment escalated. Plaintiff was in the employee changing room changing into her uniform for the night, when Defendant Karac came in while she was undressed, locked the door behind him, and walked towards her, blocking her way out.

112.     Plaintiff told Defendant Karac that she was uncomfortable, and asked him to leave several times, and he simply laughed and smirked at her, saying "everyone here changes in this room, I don't see a difference in me being here." Plaintiff begged him to unlock the door, and he

22

refused to do so until another waitress or performer who needed to change started to bang on the door to be let in.

113.    On another occasion in or about October 2017, Defendant Karac approached Plaintiff and stated to her point-blank: "It's funny how everyone here thinks we are fucking for you to keep your job."

114.    Shocked, Plaintiff asked Defendant Karac why he did not correct them and say that they were not having sex, and Defendant Karac said with a smirk and sexual look: "I like people thinking these things."

**Defendant Karac Retaliates Against Plaintiff for Refusing his
Unwanted Sexual Advances**

115.    As Defendant Karac continued to pursue and sexually harass Plaintiff, she avoided him, and refused his advances.

116.    In or about November or December 2017, Defendant Karac retaliated against Plaintiff for doing so by reprimanding her, telling her that she had an "attitude," and criticizing her unjustly. One weekend, in obvious retaliation for refusing his advances, he cancelled Plaintiff's weekend shifts entirely, stating that she needed to "take the weekend off" so that she should "re-think" her "behavior patterns."

117.    On or about December 2, 2017 Defendant Karac stood close to Plaintiff and stated that she was "acting cocky" and she needed to be "taught a lesson." He then leaned even closer to her, so that Plaintiff could feel his penis on her leg and said: "This is kind of hot." Revolted, Plaintiff turned and walked away in fear.

118.    Plaintiff tried desperately not to interact with Defendant Karac unless it involved a customer complaint, or if she needed his authorization for a transaction.

**Plaintiff Suffers a Serious Mental Health Episode Because of the
Sexual Harassment**

119.    As the sexual harassment by Defendant Karac continued and escalated, Plaintiff

suffered from extreme anxiety, stress and depression because of the harassment. In or about

December 2017, Plaintiff had a serious panic and anxiety attack as she was getting ready for

work, thinking about the environment to which she was subjected at Defendant The Box. Plaintiff

believed that her heart would stop because it was beating so fast.

120.    Plaintiff was able to travel to the hospital, where they diagnosed her for anxiety and

prescribed her mediation to treat her mental health condition. After this, Plaintiff went to a

psychiatrist to treat her crippling anxiety.

**Defendant Karac Sexually Harasses Her By Pressing His Penis on Her Buttocks**

121.    In or about April 2018, Defendant Karac approached Plaintiff while she was

working at the "service station" and said to her in a sexual manner that she should wear more

revealing clothes to look sexier.

122.    Defendant Karac then put his arm around her waist and pulled her toward him with

force so that she could feel his penis on her buttocks, and he smiled and laughed in a sexual manner.

123.    Plaintiff pulled her body away and told Defendant Karac that he was standing too

close to her and walked away quickly towards other female employees, who had seen the entire

interaction.

**Defendant Hammerstein Orders Plaintiff to Drink Alcohol With Him Or She Will Be Fired**

124.    In or about Spring of 2018, Defendant Hammerstein came to celebrate at Defendant

The Box. Defendant Hammerstein was serving alcohol "shots," and ordered Plaintiff to "take a

shot." Plaintiff declined by saying casually, "No, no, I'm good."

125.    Defendant Hammerstein said directly to Plaintiff: "You have to take a shot with me right now or you're fired," and so she reluctantly did.

126.    When Plaintiff walked away, a more seasoned waitress said to her: "You can't say no to Simon [Defendant Hammerstein], ever."

### Defendants Force Plaintiff Into an Illegal Tip Pooling Scheme

127.    In or about August 2018, Defendant Vivas came to the all-staff meeting and made an announcement: Defendants had failed to pay the service staff minimum wage, which he believed to be $10.00, and he "owed them money." But, Defendant Vivas said, he "couldn't afford" to pay everyone minimum wage. So, he said, he was reducing non-service staff salaries (i.e. coat check, production managers) from $25.00 to $10.00, raising the service staff (waitresses, busboy) salaries to $10.00, and adding non-service staff to the "tip pool," which would allow non-service staff to get nightly tips.

128.    Upon information and belief, the definition of "tip pooling" is the practice by which the tip earnings of directly tipped employees are intermingled in a common pool and then redistributed among directly and indirectly tipped employees.

129.    Also upon information and belief, under New York Law, only employees who "perform, or assist in performing, personal service to patrons as a regular and principle part of their duties that is not occasional or incidental" can participate in a tip pool.[1] Upon information and belief, any employee who has meaningful authority or control over service-employee subordinates, i.e. any supervisor or manager, may not take part in the tip pool.

---

[1] Hospitality Industry Wage Order, New York Codes, Rules, and Regulations (NYCRR) Part 146 (2016).

130.    Prior to Defendant Vivas' announcement about the tip pool, the servers included in the tip pool had been waitress' (like Plaintiff), hostesses, bussers, and "bar backs."

131.    However, Defendant Vivas announced that the tip pool must now include waitresses, hostesses, bussers, and bar backs, but also ushers, kitchen staff, bathroom attendants, coat check, support staff, lighting designers, and stage managers, and Defendant Selimi and Manager Silva. This would drastically diminish Plaintiff's tip earnings, and those of her service co-workers.

132.    Upon information and belief, the ushers, kitchen staff, bathroom attendant, coat check, support staff, lighting designers, and stage managers did not "perform, or assist in performing, personal service to patrons as a regular and principle part of their duties," and therefore were not legally eligible for the tip pool, nor were Defendant Selimi and Manager Silva.

133.    When one busser objected, saying that some of these employees were not eligible for the tip pool because they didn't service the customers, Defendant Vivas said that he didn't care, this was the way it was going to be, and if anyone didn't like the new system, they could find another job.

134.    Plaintiff and the other waitresses repeatedly complained about the illegal tip pool scheme, but Defendant Vivas ignored their complaints, did not respond to their emails, and told them that this was "the way it was going to be." He told the employees that The Box was "technically a restaurant" and so he could legally distribute the tips to everyone. The Box serves French fries, tacos and popcorn, which are not on The Box menu given to each customer and only offered on the very rare occasion when a nightclub customer asked whether there was food available. Plaintiff believes that she sold food approximately one time a month.

135.    Plaintiff and other employees who complained were retaliated against by, amongst other things, being taken off of the schedule and denied lucrative shifts.

136.    Upon information and belief, this illegal tip pool was in place each shift and every shift of Plaintiff's from August 2018 until the date that Plaintiff ceased employment at Defendants.

### Defendant Karac Propositions Plaintiff for Sex Yet Again While Alone

137.    In or about September 2018, Defendant Karac gave Plaintiff a report of her sales for the night, and then ordered her to accompany him alone to the second floor of Defendant The Box. Although she was terrified of being alone with Defendant Karac, his forceful attitude made it clear that she must do so or she would be taken off of the schedule or fired.

138.    When they arrived upstairs, Defendant Karac said in an accusatory manner that she had an "attitude" and "acted like she did not like working [at Defendant The Box.]"

139.    Feeling nervous, Plaintiff said simply that she was just "stressed because of school." Defendant Karac then propositioned her for sex, saying: "I know something that can relieve stress. I live around the corner. Do you want to come over? I know you live far uptown."

140.    Plaintiff tried to remain casual and declined his proposition, to which Defendant Karac shook his head and said: "What a shame."

### Plaintiff Continues Having Panic Attacks Throughout 2018

141.    Throughout 2018, Plaintiff continued having panic attacks as the result of the severe sexual harassment she suffered throughout 2018, and went to the hospital because of a severe panic attack at least two or three times. Plaintiff also continued to see a psychiatrist for treatment.

142.    In or about the Fall of 2018, Plaintiff was "on call" one night, when Defendant Karac ordered her to report to work. Unfortunately, Plaintiff began having a panic attack at the thought of being sexually harassed by Defendant Karac yet again.  Plaintiff told Defendant Karac

that she was having a panic attack and could not come in, which was one of the only times that

Plaintiff had ever told Defendant The Box that she could not come to her "on call" shift

143.    At her next shift, Defendant Selimi scolded Plaintiff for missing her shift, and said

that she needed to treat her on-call shifts as "real shifts," and must come in if she was called.

Plaintiff was suspended from work for one week as a result.

## Defendant Hammerstein Solicits Plaintiff for Cocaine

144.    In or about late 2018, Plaintiff was working her shift at Defendant The Box, and

Defendant Hammerstein suddenly approached her very quickly. He asked Plaintiff whether she

knew where he could procure cocaine for himself and his clients. Plaintiff, who was taken aback,

said "You mean drugs? Ah, no." Defendant Hammerstein furiously walked away.

145.    Plaintiff noticed from thereon that when Defendant Hammerstein came into

Defendant The Box with wealthy and celebrity clients, she was never assigned to his table. Upon

information and belief, this was because Plaintiff was not able (or willing) to supply Defendant

Hammerstein with drugs when he requested them from her and was reluctant to agree to the sexual

harassment she was supposed to endure with a smile and laugh.

## Defendants Engage in Age Discrimination In Their Hiring of Female Employees

146.    Throughout Plaintiff's employment at Defendants, Defendants engaged in abject

age discrimination in the hiring, retention, and giving of work and monetary opportunities with

regards to their female employees, and the female waitresses and performers, specifically.

147.    Defendant Selimi repeatedly told Plaintiff that the "older" waitresses and

performers, mainly those who were NOT in their 20s, were "old," "ugly," "sloppy," and "out of

age," and that they needed "younger" women to "entertain" their male clientele.

148.    Defendant Karac also made the same types of statements, calling "older" waitresses

and performers, mainly those who were NOT in their 20s, "old," "unattractive," "lazy," and

"sloppy." Defendant Karac explicitly told Plaintiff that he took the "older" waitresses off of the lucrative shifts and lucrative tables in favor of younger female workers in order to please and attend to male clientele, or that he terminated waitresses because of their age.

149.    Upon information and belief, Defendants refused to hire, and did not even interview, women who were older than those in the 20s and 30s, (who were in their 40s, 50s, or 60s), and thus discriminated against potential female job applicants on the basis of their age. Also, upon information and belief, even if Defendants did hire women who were in their 40s, 50s, or 60s these women were given lesser shifts, less lucrative tables, and fewer and less lucrative opportunities than younger female employees.

### Defendant Vivas Pressures Plaintiff and Female Employees to Engage in Sex Acts and Procure Drugs for Clients

150.    In or about September 2019, Defendant Vivas arrived at a regular staff meeting and spoke to the employees. He told the female waitresses and performers that he wanted them to "expand" and "heighten" the clients' experiences at Defendant The Box. Defendant Vivas also told them that Defendant The Box was "the jungle." He stated emphatically, "There are no rules here."

151.    Defendant Vivas told the employees that if clients wanted to have sex or do drugs, they should know how to get this for them, and should bring them to the employee changing rooms, the performers' dressing rooms, a private room upstairs, or a bathroom stall in order to provide them with sex or drugs, thereby ordering and coercing female employees to engage in sex acts with male clientele, or facilitate other female employees to engage in sex acts with these clients. He told them that giving clients sex and drugs made them "spend more," at Defendant The Box, and return again and again to the nightclub.

152.    By saying this, Defendant Vivas made clear that this was what he expected female employees to do if they continued working at Defendant The Box.

153.    Plaintiff and the other female employees were shocked at this order by him, and expressed their shock to each other after the meeting.

154.    Plaintiff, who did not want to supply clients with drugs or sex, did not do so, but tried to stay off management's radar so that she could keep the job that she so desperately needed in order to pay for her education and for her living expenses.

**Defendant Karac Continues to Relentlessly Sexually Harass Her**

155.    During 2019, Defendant Karac continued to relentlessly sexually harass Plaintiff.

156.    He continued to touch her offensively, look at her sexually, make unwanted sexual comments about her body, repeatedly told her that she was "sexy," commented on her body, breasts, and buttocks, and asked her to have sex with him.

157.    Defendant Karac spoke to Plaintiff about his conquests of women and his sex life, and "explained" that he liked to date women that looked like Plaintiff, who were "tall and Black," saying this because Plaintiff was a dark-skinned Latina woman

158.    On one occasion, Defendant Karac told Plaintiff: "I can't date Spanish girls. You ladies act hard to get and are too feisty."

**Defendant Karac Sexually Harasses Plaintiff By Using a Sex Toy**

159.    On or about September 20, 2019, while Plaintiff was ringing up an order at the cashier, Defendant Karac pointed to a glow-in-the-dark sex toy in the shape of a penis (a dildo) and asked Plaintiff if she thought the dildo was a "good sized cock." He then unzipped his pants and put the dildo in his pants to make it look like his penis, stepped closer to Plaintiff, and pointed his pants' area towards her.

160.     Plaintiff, disgusted, told him to "stop" and turned away and finished her task. Sara (last name unknown), an employee who worked in the coat check, observed the entire interaction and told Defendant Karac: "That's an HR (Human Resources) issue." Defendant Karac laughed derisively and responded: "Oh yeah, if we had one (an HR department) it would be."

161.     Defendant Karac made sure that Plaintiff was scheduled for shifts that he worked as a manager and ordered Plaintiff to stay working later than all the other waitresses, so that she was the last employee to close Defendant The Box, so that he could be alone with her.

162.     Because of this, Plaintiff feared for her safety when she was with Defendant Karac.

163.     Specifically, she feared that she would be sexually assaulted or raped, and she also feared that, at the very least, she would lose her job if she refused his sexual advances. She asked her co-workers to walk up to her or pull her away whenever they saw Defendant Karac talking to her. She also begged co-workers to stay with her until Defendant The Box was closed down, so that she was not alone with Defendant Karac.

**Defendant Karac Sexually Harasses Plaintiff by Using the Word "Pussy" Repeatedly**

164.     On or about October 8, 2019, Plaintiff's dog had a medical emergency, and she told Defendants that she must miss the mandatory work meeting.

165.     When she returned to work, Defendant Karac said to Plaintiff: "Shanell, I haven't spoken to you in a while. I heard something happened with your pet. How's your *pussy*-cat doing?" Defendant Karac said the word "pussy" in such a way as to make clear that he was referring to the slang word for female genitalia.

166.     Plaintiff told him that she did not own a cat, but it was her dog. When another employee approached to talk to Plaintiff about her pet, Defendant Karac turned to them in order to stop them and said: "Don't you see, I'm talking to Shanell about her *pussy*-cat."

167.     Plaintiff, humiliated and upset, ignored Defendant Karac's obvious use of a sexual innuendo, and turned to speak to her other colleague about her dog's illness.

**Plaintiff Reports Defendant Karac's Severe Sexual Harassment of Her to Defendant Vivas**

168.    On or about October 14, 2019, Plaintiff spoke to a female manager ("Jane Doe Two") about the fact that Defendant Karac was sexually harassing her. Jane Doe Two said "Oh yeah, he's doing that to me, too." Jane Doe Two said she heard that he also sexually harassed the hostess, who was a Black female ("Jane Doe Three"). Jane Doe Two said that the three women should band together and tell Defendant Vivas about the sexual harassment when he was at Defendant The Box.

169.    Plaintiff got up the courage to report Defendant Karac's severe sexual harassment of her to Defendant Vivas but had to wait even longer until he returned to Defendant The Box. Although she knew that she was risking her job, she could not stand to work in the discriminatory, sexually harassing, and unsafe work environment without remedy.

170.    On or about October 22, 2019, Plaintiff approached Defendant Vivas and told him that Defendant Karac had been sexually harassing her repeatedly throughout her time at Defendant The Box. She told him of the instances when Defendant Karac pressed his penis against hers, the incident in which he placed a dildo in his pants, and the "pussy" comments, as well as his propositioning her. Plaintiff told Defendant Vivas that she had several witnesses who had seen Defendant Karac sexually harass her each day that she worked and named five specific employees who could serve as eye-witnesses.

171.    Defendant Vivas looked unimpressed with the report and stated "What do you think I should do with him? These types of accusations can ruin someone's career." Defendant Vivas mentioned to Plaintiff that she had her share of "good" shifts, and that she was generating as much money as the senior waitresses. Plaintiff was in utter shock by Defendant Vivas' comments.

172.    Plaintiff said her complaint was NOT about money, it was to ensure her safety in the work environment. Defendant Vivas stated that he would "look into it" and get back to her.

173.    That night, Defendant Karac sexually harassed her yet again. Defendant Karac pinned her into a corner, put his arm around her waist, and asked Plaintiff "how she was doing." Plaintiff

told him to let her go and tried to remove his arm, but he would not let go. Thankfully, one of her co-workers purposefully interrupted the interaction so that Plaintiff could escape, saying that Plaintiff was being summoned by a customer.

174.    Upon information and belief, Jane Doe Two and Jane Doe Three also spoke to Defendant Vivas about the sexual harassment (and they told Plaintiff that they had done so).

**Defendant Vivas Thwarts an Investigation, Calls Her a Liar, and Refuses to Act**

175.    In or about November 18, 2019, Defendant Vivas approached Plaintiff and asked to talk to her about her report against Defendant Karac.

176.    He told Plaintiff that he had made "an investigation" and that no one had corroborated her story. However, he said, he had suspended Defendant Karac for two weeks. He also rolled his eyes and complained that he was forced "to pay $50,000 to re-train" Defendant Karac, blaming her for having to do so, as well as having to change his flight arrangements to London on Plaintiffs' behalf.

177.    Defendant Vivas ordered Plaintiff not to talk to anyone about her report or the alleged "investigation," and offered her additional weekend shifts, upon information and belief, to keep her silent about her sexual harassment allegations. To Plaintiff's' knowledge, Jane Doe Two was demoted from Manager to Hostess and Jane Doe Three was promoted to a waitress.

178.    Upset that Defendant Vivas had said that no one corroborated her story, Plaintiff offered to have a meeting with Defendant Vivas and Defendant Karac in order to report the harassment yet again but Defendant Vivas said "without concrete proof, there is nothing I can do." Plaintiff then spoke individually with each of the five witnesses whose names she had given to Defendant Vivas. Each witness said that Defendant Vivas had never talked to them.

**Plaintiff is Forced to Work With, and be Retaliated Against by Defendant Karac**

179.    Two weeks later, in or about late December 2019, Defendant Karac returned to Defendant The Box. Without so much as a word about what had happened, or an apology, or a

discussion of some kind that Defendant Karac would not retaliate against her, or who she should report it to if she did, Plaintiff was immediately forced to work with and report to Defendant Karac as her manager.  She was terrified.

## Defendant Karac Retaliates Against Plaintiff for Her Report

180.    Just as she feared he would, in or about December 2019 through February 2020, Defendant Karac retaliated against Plaintiff for her report to Defendant Vivas concerning his sexual harassment of her. He subjected her to the silent treatment, singled her out for criticism, raised his voice and yelled at her, gave her fewer and less desirable shifts, and less lucrative tables, and she was micromanaged by both Defendant Vivas and Defendant Karac in case a mistake was made to have Plaintiff fired.

181.    Upon information and belief, Defendant Karac was making her work environment so hostile and unbearable that she would be forced to quit, and Defendant The Box was doing nothing to protect her from him or even limit their interactions.

182.    Plaintiff was far too scared to report the retaliation, and, given that Defendant Vivas had failed to adequately investigate or punish Defendant Karac for the harassment, and had essentially only punished her.

## Plaintiff is Constructively Terminated from Defendants

183.    In or about March 2020, Governor Andrew Cuomo signed the "New York State on PAUSE" Executive Order, which ordered the closure of non-essential business statewide because of the Covid-19 pandemic. As a result, Defendants' employees were furloughed until further notice.

184.    Upon information and belief Defendant The Box has opened for business since the "New York Shut Down" and Defendants have not contacted Plaintiff for work but have contacted other employees to work. Upon information and belief, the fact that Defendants have not contacted Plaintiff is in retaliation for her complaining about discrimination and sexual harassment, about the illegal tip pooling scheme that Defendants imposed upon Plaintiff, and her objecting to and

complaining about Defendants' refusal to pay her the commissions that she was owed as per her employment agreement. Also upon information and belief, Plaintiff was considered a "liability" because of her outspoken objection to discrimination and harassment, and so she was constructively terminated. Upon information and belief, the Individual Defendants who discriminated against Plaintiff are all still working at Defendant The Box.

185.    Also upon information and belief, Plaintiff suffered serious mental health issues because of the harassing and discriminating experiences at Defendant The Box, and has since sought professional medical treatment because of these health issues.

### Defendants Did Not Pay Plaintiff the Legally Mandated Minimum Wage Throughout Her Employment at Defendants

186.    From the beginning of her employment at Defendants in July 2017, until on or about December 30, 2017, Plaintiff, a service employee receiving tips working in New York City, was paid at a rate of $8.00 an hour for her scheduled shifts as a server. However, the New York City Minimum Wage for a service employee receiving tips during that time period was $9.15 an hour.

187.    As such, Defendants failed to pay Plaintiff the legally mandated minimum wage during that time period.

188.    From December 31, 2017 to December 30, 2018, Plaintiff was paid $8.75 an hour.

189.    However, the New York City Minimum Wage for a service employee receiving tips during that time period was $10.85 an hour. As such, Defendants failed to pay Plaintiff the legally mandated minimum wage during that time period.

190.    From December 31, 2018 to December 30, 2019, Plaintiff was paid at a rate of $8.75 an hour. However, the New York City Minimum Wage for a service employee receiving tips during that time period was $12.50. As such, Defendants failed to pay Plaintiff the legally mandated minimum wage during that time period.

191.    From December 31, 2019 to the end of her employment, Plaintiff was paid $10.00 an hour. However, the New York City Minimum Wage for a service employee receiving tips during that time period was $12.50. As such, Defendants failed to pay Plaintiff the legally mandated minimum wage during that time period.

### This Action Is Timely Under CPLR 214-J (The Adult Survivors Act)

192.    This action is timely because it falls under the Adult Survivors Act and is brought during the one-year time period set forth in that Section CPLR 214-j. The claims brought here allege intentional and negligent acts and omissions for physical, psychological, and other injuries suffered as a result of conduct that would constitute sexual offenses as defined by § 130 of the New York Penal Law committed against a person who is eighteen years of age or older. Such claims have been revived by CPLR 214-j and may be commenced between November 24, 2022, and November 24, 2023.

193.    The underlying conduct described herein constitutes at least the following crimes under New York Law: New York Penal Law §§ 130.52 (forcible touching) and 130.55 (sexual abuse in the third degree).

194.    The Adult Survivors Act applies to review the statute of limitations for each of the causes of action asserted below.

### Plaintiff Demands a Jury Trial in This Matter

195.    Plaintiff demands a jury trial in this matter.

### THE FIRST CAUSE OF ACTION

*(Gender and Race Discrimination and Sexual Harassment in Violation of the New York State Human Rights Law and the New York City Human Rights Law against All Defendants)*

196.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

36

197.     Defendants have discriminated against Plaintiff on the basis of her gender and race in violation of the New York State Human Rights Law and the New York City Human Rights Law. Plaintiff has suffered both disparate impact and disparate treatment as a result of Defendants' wrongful conduct.

198.     Defendants have discriminated against Plaintiff by subjecting her to severe and pervasive sexual harassment, a hostile work environment, discriminatory pay, discriminatory denial of promotions, and other forms of discrimination on the basis of her sex and race, in violation of the law.

199.     Defendants' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

200.     By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for violations of the New York City Human Rights Law and the New York State Human Rights Law as to all Defendants. Plaintiff shall seek attorneys' fees and punitive damages.

## THE SECOND CAUSE OF ACTION

*(Retaliation in Violation of the New York State Human Rights Law*
*and the New York City Human Rights Law against All Defendants)*

201.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

202.     Plaintiff reported to Defendants about Defendants' discriminatory treatment of her.

203.     In retaliation, Defendants subjected Plaintiff to a series of adverse employment actions including, but not limited to, subjecting Plaintiff to a hostile work environment, termination, and other forms of retaliation.

204.   Defendants' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff.

205.   As a result of Defendants' conduct alleged in this Second Amended Complaint, Plaintiff has suffered, and continues to suffer harm, including, but not limited to, lost earnings, lost benefits, other financial losses, and non-economic damages.

206.   By reason of Defendants' retaliation, Plaintiff is entitled to all remedies available for violations of the New York State Human Rights Law and the New York City Human Rights Law as to all Defendants. Plaintiff shall seek attorney' fees and punitive damages.

## THE THIRD CAUSE OF ACTION

*(Violation of the Trafficking Victims Protection Act, 18 U.S.C. § 1591,
against Defendant Hammerstein, Defendant Vivas, Defendant Selimi,
and Defendant Karac)*

207.   Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

208.   Defendant Hammerstein and Defendant Vivas travelled for business to London and across the United States to recruit female waitresses and performers to work at Defendant The Box. All Individual Defendants used cell phones, the internet and social media accounts to do the same, thereby engaging in interstate and/or foreign commerce for Defendant The Box.

209.   Defendant Hammerstein, Defendant Vivas, Defendant Selimi, and Defendant Karac recruited, enticed, coerced, and ordered Plaintiff and other female employees of Defendant The Box to lure male clientele to Defendant The Box nightclub, and to engage in commercial sex acts with these men.

210.   Defendant Hammerstein, Defendant Vivas, Defendant Selimi and Defendant Karac ordered Plaintiff and other female employees to use cell phones, the internet, and social media accounts to lure male clientele to Defendant The Box nightclub,, thereby ordering them to engage in interstate and/or foreign commerce for Defendant the Box.

211.    Defendant Hammerstein, Defendant Vivas, Defendant Selimi, and Defendant Karac recruited, enticed, coerced and ordered Plaintiff and other female employees to do so by promising them money, more desirable and more lucrative work shifts, better employment opportunities, career advancement, and also threatening them with termination or the denial of work shifts if they did not comply.

212.    By way of example, Plaintiff was unable to obtain male clientele for Defendant The Box, she was caused extreme duress by Defendant Karac who made it clear that female employees who did not produce clientele would be punished with less working hours and less lucrative working shifts at Defendant The Box. Plaintiff was repeatedly contacted by Defendant Karac during non-working hours regarding her productivity in securing customers for Defendants.

213.    Defendant Hammerstein, Defendant Vivas, Defendant Selimi, and Defendant Karac knew that they would use fraud and coercion on Plaintiff and other female employees, and this was a pattern and policy at Defendants for many years.

214.    Additionally, Plaintiff and other female coworkers were ordered by Defendants to satisfy their male customers in whichever ways they demanded, which were often sexual in nature and in private areas provided by Defendants for clients to engage with Defendants' female employees.

215.    While in the aforementioned private areas with clients, Plaintiff was often propositioned by customers to return home with them in exchange for financial compensation, which was highly encouraged by Defendants.

216.    While Plaintiff always declined to return home with the customer, she was pressured to ensure that the customer stayed happy and so she was pressured to find another female employee who was willing to entertain the client and go home with him for financial compensation as was expected of female employees of Defendant The Box.

217.     In sum, Defendant Hammerstein, Defendant Vivas, Defendant Selimi, and Defendant Karac engaging in interstate and/or foreign commerce, knowingly ordered or coerced Plaintiff and other female employees, offering them something of value, knowing that they would use this offer as a means to defraud, force and coerce Plaintiff and other employees into providing sex acts to male clientele at Defendant The Box.

218.     By reason of Defendants' illegal activity, Plaintiff is entitled to all remedies available for violations of the Trafficking Victims Protection Act as to all Defendants. Plaintiff shall seek attorneys' fees and punitive damages.

## THE FOURTH CAUSE OF ACTION

*(Violation of the Trafficking Victims Protection Act, 18 U.S.C. § 1591, against Defendant 189 Chrystie Street Partners, LP, Defendant The Box and Defendant Variety Worldwide)*

219.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

220.     Defendant 189 Chrystie Street Partners, LP, Defendant The Box, and Defendant Variety Worldwide knowingly participated in Defendant Hammerstein, Defendant Vivas, Defendant Selimi, and Defendant Karac's venture in violation of 18 U.S.C. § 1591, by knowingly benefiting from, facilitating, and receiving value for the venture violating 18 U.S.C. § 1591.

221.     Defendant 189 Chrystie Street Partners, LP, Defendant The Box and Defendant Variety Worldwide knew, or were in reckless disregard of the fact, that Defendant Hammerstein, Defendant Vivas, Defendant Selimi, and Defendant Karac would order and/or coerce Plaintiff and other female employees of Defendant The Box to lure male clientele to Defendant The Box nightclub, so they could recruit, entice, coerce and order female employees to engage in commercial sex acts at Defendant The Box nightclub. Defendant 189 Chrystie Street Partners, LP, Defendant The Box and Defendant Variety Worldwide knew that it was pattern and practice for this to occur.

222.    Plaintiff was often asked by male clientele of Defendant The Box to return home with them at the end of the night in exchange for financial compensation, which was expected of her as a female employee of Defendant The Box.

223.    Despite such knowledge, Defendant 189 Chrystie Street Partners, LP, Defendant The Box and Defendant Variety Worldwide continued to pay for and facilitate these ventures, and/or actively participate in these schemes, which violated 18 U.S.C. § 1591, and to profit from them.

224.    Upon information and belief, in exchange for paying for, facilitating, and actively participating in these schemes, which violated 18 U.S.C. § 1591, Defendant 189 Chrystie Street Partners, LP, Defendant The Box and Defendant Variety Worldwide received financial benefits.

225.    By reason of Defendants' illegal activity, Plaintiff is entitled to all remedies available for violations of the Trafficking Victims Protection Act as to all Defendants. Plaintiff shall seek attorneys' fees and punitive damages.

## THE FIFTH CAUSE OF ACTION

*(Aiding and Abetting, in Violation of the Trafficking Victims Protection Act, 18 U.S.C. § 1591, against Defendant 189 Chrystie Street Partners, LP, Defendant The Box and Defendant Variety Worldwide)*

226.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

227.    Defendant 189 Chrystie Street Partners, LP, Defendant The Box, and Defendant Variety Worldwide aided and abetted Defendant Hammerstein, Defendant Vivas, Defendant Selimi, and Defendant Karac's venture in violation of 18 U.S.C. § 1591 by knowingly supporting, playing an active role in, benefiting from, facilitating, and receiving value for the venture violating 18 U.S.C. § 1591.

228.    Defendant 189 Chrystie Street Partners, LP, Defendant The Box and Defendant Variety Worldwide knew, or were in reckless disregard of the fact, that Defendant Hammerstein, Defendant Vivas, Defendant Selimi, and Defendant Karac would order and/or coerce Plaintiff and

other female employees of Defendant The Box to lure male clientele to Defendant The Box nightclub, so they could recruit, entice, coerce and order Plaintiff and other female employees to engage in commercial sex acts at Defendant The Box nightclub. Defendant 189 Chrystie Street Partners, LP, Defendant The Box and Defendant Variety Worldwide knew that it was pattern and practice for this to occur.

229.    Despite such knowledge, Defendant 189 Chrystie Street Partners, LP, Defendant The Box and Defendant Variety Worldwide continued to pay for and facilitate these ventures, and/or actively participate in these schemes, which violated 18 U.S.C. § 1591, and to profit from them.

230.    Defendant 189 Chrystie Street Partners, LP, Defendant The Box and Defendant Variety Worldwide's aiding and abetting of Defendant Hammerstein, Defendant Vivas, Defendant Selimi, and Defendant Karac's venture through support and affirmative acts did in fact aid and abet them in committing these violations of 18 U.S.C. § 1591.

231.    Upon information and belief, in exchange for paying for, facilitating, and actively participating in these schemes which violated 18 U.S.C. § 1591, Defendant 189 Chrystie Street Partners, LP, Defendant The Box and Defendant Variety Worldwide received financial benefits.

232.    By reason of Defendants' illegal activity, Plaintiff is entitled to all remedies available for violations of the Trafficking Victims Protection Act as to all Defendants. Plaintiff shall seek attorneys' fees and punitive damages.

## THE SIXTH CAUSE OF ACTION

*(Unpaid Wages and Minimum Wage Compensation under the Fair Labor
Standards Act Against All Defendants)*

233.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

234.    Plaintiff has consented in writing to be a party to this action, pursuant to 29 U.S.C. §216(b).

235. At all times relevant to this action, Plaintiff was engaged in commerce or the production of services and goods for commerce within the meaning of 29 U.S.C. §§206(a) and 207(a).

236. At all times relevant to this action, Defendants were employers engaged in commerce or the production of goods for commerce within the meaning of 29 U.S.C. §§206(a) and 207(a).

237. Defendants willfully failed to pay Plaintiff a minimum wage in accordance with 29 U.S.C. §§201, 202 and 203.

238. Defendants' violations of the FLSA, as described in this Complaint, have been willful and intentional.

239. Defendants have not made a good faith effort to comply with the FLSA with respect to Plaintiff's compensation.

240. Due to Defendants' FLSA violations, Plaintiff is entitled to recover from Defendants, jointly and severally, her unpaid minimum wages and an equal amount in the form of liquidated damages, as well as reasonable attorneys' fees and costs of the action including interest, pursuant to the FLSA, specifically 29 U.S.C. §216(b).

241. Plaintiff was not paid for work that she engaged in "off the clock" for Defendants.

242. Defendants willfully violated the FLSA.

243. Plaintiff is also entitled to liquidated damages and attorneys' fees for Defendants' violation of the FLSA's provisions.

## THE SEVENTH CAUSE OF ACTION

*(Unpaid Wages and Minimum Wage Compensation under the New York Labor Law Against All Defendants)*

244. Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

245.    Plaintiff re-alleges and incorporates by reference all allegations in all preceding paragraphs.

246.    At all times relevant to this action, Plaintiff was employed by Defendants within the meaning of NYLL §§2 and 651.

247.    At all times relevant to this action, Defendants were employers within the meaning of NYLL.

248.    Defendants failed to record, credit or compensate Plaintiff the applicable minimum hourly wage, in violation of the New York Minimum Wage Act, specifically NYLL §652.

249.    Defendants also failed to pay Plaintiff the required minimum wage, which Plaintiff was entitled to receive under NYLL §652, in violation of 12 N. Y. C. R. R. 137-1.3.

250.    Due to Defendants' NYLL violations, Plaintiff is entitled to recover from Defendants, jointly and severally, her unpaid minimum wages and an amount equal to her unpaid minimum wages in the form of liquidated damages, as well as reasonable attorneys' fees and costs of the action, including interest in accordance with NYLL §198 (1-a).

## THE EIGHTH CAUSE OF ACTION

*(Illegal Pay Deductions and Deductions from Gratuities Against All Defendants)*

251.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

252.    Defendants routinely and willfully withheld portions of Plaintiff's tips  by requiring her to share her tips with employees that were ineligible to participate in a tip-sharing or tip-pooling system.

253.    As a result of Defendants' willful and unlawful conduct, Plaintiff seeks and is entitled to recover her respective withheld, diverted, and unpaid gratuities plus interest, damages pursuant to

NYLL Article 6 § 198, attorneys' fees, costs, and pre- and post- judgment interest along with such other relief as this Court deems just and proper.

## THE NINTH CAUSE OF ACTION

*(Breach of Contract: Illegal Withholding of Commissions Against All Defendants)*

254.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

255.     Defendants entered into an agreement with Plaintiff whereby she would receive commissions of 10% of the gross spending of a client who came to Defendant The Box if she "clienteled" for Defendants. Plaintiff thereafter entered into performance of the agreement by "clienteleing" for Defendants. Though she requested a reconciliation of the commissions she was due, Defendants, without cause or justification, unliterally refused to pay Plaintiff the owed commissions she earned.

256.     Defendants have breached the terms of their agreement with Plaintiff, and there are due and owing to Plaintiff sums, no portion of which has been paid, although demanded by Plaintiff.

257.     By reason of the foregoing, Plaintiff is entitled to judgment against Defendants for unpaid commissions, unpaid compensation, damages as permitted by law, pre-judgment and post-judgment interest, reasonable attorneys' fees and costs of the action.

258.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

259.     Defendants entered into an agreement with Plaintiff whereby she would receive commissions if she "clienteled" for Defendants. Plaintiff thereafter entered upon performance of the agreement by "clienteleing" for Defendants.

45

260.    Upon information and belief, Defendants accepted the values from clients procured through Plaintiff's efforts, without paying the agreed upon commission for the "clienteling" Plaintiff engaged in.

261.    Plaintiff relied upon false representations made by Defendants and was induced to "clientele" for them. Were it not for such false representations and promises, Plaintiff would not have worked to "clientele" for Defendants.

262.    Upon information and belief, Defendants made material statements of fact, that they knew, or had reason to know were false, to induce Plaintiff to "clientele."

263.    By reason of the foregoing, Defendants are liable for fraud and unjust enrichment, and thereby owe Plaintiff unpaid commissions, unpaid compensation, damages as permitted by law, pre-judgment and post-judgment interest, reasonable attorney's fees and costs of the action.

### THE TENTH CAUSE OF ACTION

*(Fraud and Unjust Enrichment: Illegal Withholding of Commissions*
*Against All Defendants)*

264.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

265.    Defendants entered into an agreement with Plaintiff whereby she would receive commissions if she "clienteled" for Defendants. Plaintiff thereafter entered upon performance of the agreement by "clienteling" for Defendants.

266.    Upon information and belief, Defendants accepted the values from clients procured through Plaintiff's efforts, without paying the agreed upon commission for the "clienteling "Plaintiff engaged in.

267.    Plaintiff relied upon false representations made by Defendants and was induced to "clientele" for them. Were it not for such false representations and promises, Plaintiff would not have worked to "clientele" for Defendants.

268.    Upon information and belief, Defendants made material statements of fact, that they knew or had reason to know were false, to induce Plaintiff to "clientele."

By reason of the foregoing, Defendants are liable for fraud and unjust enrichment, and thereby owe Plaintiff unpaid commissions, unpaid compensation, damages as permitted by law, pre-judgment and post-judgment interest, reasonable attorneys' fees and costs of the action.

## THE ELEVENTH CAUSE OF ACTION

*(Violations of Labor Law § 191 et. seq. due to Withholding of Commissions)*

269.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

270.    Defendants have failed to pay the commissions which were owed to Plaintiff.

271.    The commissions owed to Plaintiff have been due and owing for more than five days after they became due ,and more than five days since Plaintiff was terminated.

272.    Defendants further violated Section 191(1)(c) of the New York Labor Law by not having a written commission agreement with Plaintiff which, *inter alia*, provided details about the payment of commissions after Plaintiff's employment termination.

273.    As a result, thereof, Plaintiff has been damaged and is entitled to her commissions, double damages, attorneys' fees, costs, and disbursements.

## THE TWELFTH CAUSE OF ACTION

*(Retaliatory Discharge in Violation of New York Labor Law Section 215)*

274.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

275.    New York Labor Law § 215, part of the Wage Theft Prevention Act, provides anti-retaliation provisions of the New York Labor Law to protect workers who bring complaints of

conduct they reasonably and in good faith believe to be in violation of the WTPA, including failure to pay earned commissions and illegal tip pooling.

276.    Plaintiff engaged in protected conduct by complaining to Defendants about their failure to pay all of her earned commissions due and payable to her and the illegal tip pool system imposed by Defendants.

277.    As a result of Plaintiff's protected conduct, Defendants retaliated against Plaintiff in multiple ways, including taking away lucrative shifts, and leaving her off of the schedule. As a result thereof, Plaintiff has been damaged in an amount to be determined at trial.

## THE THIRTEENTH CAUSE OF ACTION

### *(Fraudulent Inducement)*

278.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

279.    Defendants made material omissions and false representations to Plaintiff concerning the terms of their working relationship, including the omission that they did not intend to honor the commissions agreement and that they would not pay her the more than $10,000 in commissions she was owed.

280.    Defendants made such material omissions and false representations with the intent to induce Plaintiff to accept their offer of employment and to remain employed thereafter.

281.    Plaintiff would not have accepted Defendants' offer of employment if the Defendants had revealed their true intentions.

282.    Plaintiff has been severely injured as a result of Defendants' wrongful and fraudulent inducements.

283.    As a result thereof, Plaintiff has been damaged in an amount to be determined at trial.

**PRAYER FOR RELIEF**

**WHEREFORE**, for the foregoing reasons, Plaintiff demands judgment against Defendants, for all compensatory, emotional, physical, and punitive damages, lost pay, front pay, injunctive relief, and any other relief to which the Plaintiff is entitled. It is specifically requested that this Court grant judgment in favor of Plaintiff as follows:

(i)    On the First Cause of Action, awarding Plaintiff compensatory and punitive damages in an amount to be determined at trial but in any case, no less than $1,500,000.

(ii)    On the Second Cause of Action, awarding Plaintiff compensatory and punitive damages in an amount to be determined at trial but in any case, no less than $1,500,000.

(iii)    On the Third Cause of Action, awarding Plaintiff compensatory and punitive damages in an amount to be determined at trial but in any case, no less than $1,500,000;

(iv)    On the Fourth Cause of Action, awarding Plaintiff compensatory and punitive damages in an amount to be determined at trial but in any case, no less than $1,500,000;

(v)    On the Fifth Cause of Action, awarding Plaintiff compensatory and punitive damages in an amount to be determined at trial but in any case, no less than $1,500,000;

(vi)    On the Sixth Cause of Action, awarding Plaintiff unpaid wages, unpaid compensation, liquidated and statutory damages as permitted by law, pre-judgment and post-judgment interest, reasonable attorney's fees and costs of the action;

(vii)    On the Seventh Cause of Action, awarding Plaintiff unpaid wages, unpaid compensation, liquidated and statutory damages as permitted by law, pre-judgment and post-judgment interest, reasonable attorney's fees and costs of the action;

(viii)    On the Eighth Cause of Action, awarding Plaintiff unpaid wages, unpaid compensation, liquidated and statutory damages as permitted by law, pre-judgment and post-judgment interest, reasonable attorney's fees and costs of the action;

(ix)    On the Ninth Cause of Action, awarding Plaintiff unpaid commissions, unpaid compensation, liquidated and statutory damages as permitted by law, pre-judgment and post-judgment interest, reasonable attorney's fees and costs of the action;

(x)    On the Tenth Cause of Action, awarding Plaintiff unpaid commissions, unpaid compensation, liquidated and statutory damages as permitted by law, pre-judgment and post-judgment interest, reasonable attorney's fees and costs of the action;

(xi)    On the Eleventh Cause of Action, awarding Plaintiff unpaid commissions, unpaid compensation, liquidated and statutory damages as permitted by law, pre-judgment and post-judgment interest, reasonable attorney's fees and costs of the action;

(xii)    On the Twelfth Cause of Action, awarding Plaintiff unpaid commissions, unpaid compensation, liquidated and statutory damages as permitted by law, pre-judgment and post-judgment interest, reasonable attorney's fees and costs of the action;

(xiii)    On the Thirteenth Cause of Action, awarding Plaintiff unpaid commissions, unpaid compensation, liquidated and statutory damages as permitted by law, pre-judgment and post-judgment interest, reasonable attorney's fees and costs of the action;

(xiv)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees, together with such other and further relief as this court deems equitable, proper, and just.

Dated:  New York, New York
        November 21, 2023                          Respectfully submitted,

                                                   GODDARD LAW PLLC
                                                   *Attorney for Plaintiff*

                                                   By: */s/ Megan S. Goddard*
                                                   Megan S. Goddard, Esq.
                                                   39 Broadway, Suite 1540
                                                   New York, New York 10006
                                                   Office: 646-964-1178
                                                   Fax: 212-473-8705

Megan@goddardlawnyc.com